Your Honor, second case in the morning, call 212-1205, Fairview Nursing Plaza v. Lacey Nelson. On behalf of the adjunct, Ms. Eva Beyerly, on behalf of the attorney, Mr. Nathan Williams. Good morning, counsel. Good morning. May it please the court. Counsel, once again, I'm Eva Beyerly, and I'm here for the appellant, Fairview Nursing Plaza. In this case, we have a breach of contract. There was a contract between Fairview Nursing Plaza and Ms. Lacey Nelson. This contract said that Ms. Nelson, or that Fairview Nursing Plaza, would pay an $8,000 buyout to her former employer if Ms. Nelson would come work at Fairview. But there was a condition precedent to that, isn't that correct? That is, the payment, she would have to repay that money if she resigned within the first year, isn't that correct? That is correct, Your Honor. And actually, for clarity, the contract said Fairview would pay the $8,000, and only if she resigned during the first year, she would have to repay the $8,000. Correct. Okay. Fairview Nursing Plaza did, in fact, pay the $8,000. Ms. Nelson did, in fact, go work for Fairview. And Ms. Nelson resigned within the first five months that she was there. Ms. Nelson did not pay the $8,000 penalty. What's the standard of review? I'm sorry, go ahead. And obviously, that is a contested issue, Your Honor. I contend that it should be a de novo standard of review. I found a case that stated that when it comes to the burden of proof and whether or not a party proved their burden of proof, it's typically a question of fact. And that would typically be under the manifest way to the evidence standard. However, G. Noble stated that if the evidence was, and let me confirm the language, if the only reasonable deduction that can be made from the evidence, the reviewing court would review it de novo. But that case involved a summary judgment, a motion for summary judgment, didn't it? That was very different. While it did involve a motion for... And whether there were any issues of material fact is what the court was looking for there. Correct, Your Honor. And at the same time, though, they still had to review whether or not the party that was advocating for that relief had in fact met their burden. And that's where I believe this case can also be applicable to our situation. But regardless of that, I'm also here to argue that even if this court finds the manifest way to the evidence standard of review applies, a finding should still be entered in favor of therapy, nursing, and counseling. Well, you know the definition of manifest way to the test is an opposite conclusion is clearly apparent. So that's a fairly substantial hurdle. Absolutely. Let me shift gears for a second. The plaintiff starts out, or the defendant starts out by saying, I respectfully request to resign without consequence. So ostensibly it sounds like it's a resignation. I understand the position. How do you respond to this issue, though? She goes on to say that she would be happy to discuss other remedies that could work. So how do you respond to maybe the other side's anticipated argument? This is a contingent resignation, depending upon what other responses your client gives to her. So how do you respond to that? It wasn't a definitive resignation. Certainly, Your Honor. If you look at the record, we have testimony from Mr. Thompson, who was the administrator of the facility. We have testimony from Ms. Manthe, who was the D.O.N. of the facility, that both parties had offered various solutions to Ms. Nelson during that time period. So there was a response to this invitation to negotiate, if you will? Yes, there was. And you will see from the testimony that all of those suggestions were flatly denied. But then let's take a look at the part of that letter that said this resignation will not be effective until two weeks from now. So technically then we could look at it as you'd have to get through the two weeks until it was anything other than a conditional resignation. Correct? Correct. And then wasn't there testimony that before the two weeks elapsed that she was terminated and escorted out of the facility? I believe the testimony was more clearly that the facility had moved up the timetable, and the reason for that was first they presented her with multiple options to correct the problem she had identified. None of these options were acceptable to her, which you could thus argue that she kind of put the resignation into play. If you can't meet any of my conditions at all, the fact that it's conditional, that's not really true. Well, how could they unilaterally move up the date of her resignation? The testimony also shows that during this time period, Ms. Nelson was starting to badmouth the facility. She was engaging in behaviors that were not conducive to the day-to-day business of providing skilled care to the elderly in the community. So effectively she terminated herself. She resigned herself. She moved up her own timetable. Well, those are words of art. Yeah, go ahead. There are options that could have been explored. For example, put her on paid leave and let the two weeks expire rather than just showing her the door, which is what the trial court found, correct? Unfortunately, we don't have much by way of the trial court order. The trial court order more clearly found that we just did not meet the burden of proof when it came to whether or not this was a resignation. But it was based upon the evidence that had been presented. He found that there had been a termination. My point is that there are ways to achieve the result of allowing her to resign and still attempt to meet her conditions, but just keep her off premises. That happens all the time in employment situations. And I will certainly acquiesce that it is true. However, at the same time, my client clearly saw this letter of resignation taken in concert with her activities, with her actions in the facility as an effective resignation. Well, in the real world, you're arguing, okay, let's be realistic here. It's a practical matter if she resigned herself. But I guess looking at this, I want your response from a technical legal standpoint. The day that she walked out the door, she didn't leave on her own volition. The employer required that, correct? That is correct, Your Honor. And indeed, the trial court, Judge Fabiano, heard testimony from not only the defendant but Dr. Pryor and Assistant Director of Nursing that she was terminated. So that was the testimony that was given to the trial court on that issue, isn't that correct?  Your Honor, when it comes to the Assistant Director of Nursing, her testimony also stated that she witnessed the DON being handed the letter of resignation and being surprised by it. Well, that was a couple weeks before. Correct, when she handed in the letter. Right. She also testified that the Director of Nursing did not want to accept the letter of resignation. Additionally, when it comes to Dr. Pryor, he testified that his knowledge of her being terminated was from Ms. Nelson. Additionally, he testified that if he had known about the resignation letter, he probably would have come to a different conclusion. And again, my contention here is that all of this evidence, when taken in concert, it shows that even though Fairview may have asked her to leave sooner than the two-week period of time, she still intended to resign and by her actions effectuated that resignation. In this case, the facility had to protect its other interests, namely the life and safety of other residents in the facility, and just could not put itself in a position where they could not trust the person that they required to provide wound care, which as I'm quite versed in the nursing home world, wound care is actually a really important issue for all these facilities. So I can absolutely understand that these concerns would be grave to our facility. Now you rely on the Addis case, but that case is really distinguishable from the case at Barr, isn't it? In that case, the defendant had already found a new job prior to submitting the letter of resignation. In this case, Ms. Nelson couldn't find a job until three months after she left the facility. In Addis, the defendant wrote the letter supposedly, quote, on her own volition. Here there was testimony that there were others who asked her to write it. So if there are these distinguishing and other distinguishing factors, why should we give any weight to this case? Certainly. Judge, I actually don't think that they're that far apart. I believe there are some serious concerns when it comes to the testimony that she was forced or asked to write this letter. First off, her testimony didn't say that she was asked to write a letter of resignation. It said that she was asked to write a letter outlining her concerns. That's even assuming that that testimony was correct. I think it's important in light of this case and in light of my argument to consider, too, that the trial court made essentially two rulings. One, that there was an enforceable contract, and two, that there was no resignation. I think that we need to look at the first ruling, that there was an enforceable contract, in a little bit more detail. As you'll see from the record, there were two contracts that were in play. One that was presented by Fairview Nursing Plaza, and one that Ms. Nelson testified to under oath with a handwritten addition that would have let her out of the buyout agreement. Necessarily to find that she would have been subject to this agreement had she resigned, the trial court had to doubt Ms. Nelson's testimony under oath that, no, no, no, this handwritten version is the proper version. So I think it's really important to keep that in mind, too, when you look at her later testimony that she was asked to write this letter of resignation. So you're saying that, one, they go hand in hand, that that handwritten amendment to the contract reflects on the letter? I do believe it does. I think it reflects on her truthfulness, in particular her truthfulness under oath. That's the trial court's determination, though, not ours. It absolutely is, and my argument is here that the manifest weight of the evidence calls that trial court determination into question, because the trial court determination really wants to have it both ways. She's truthful when it comes to, I was forced to write this letter, and the record shows that she's the only one who testified to that fact. And the trial court is also trying to say, but she wasn't truthful when it comes to which contract is in play. And I think that's a grave issue. And then, in light of this, obviously, Fairview Nursing Plaza requests for a finding out hearing. Thank you. Thank you. You'll have time on the call. Mr. Reyes. May I please report? Good morning, Your Honors. My name is Nathan Reyes on behalf of Ms. Nelson, the defendant. Your Honors, I really have just three basic points to make. The first one is, this is reviewed under manifest weight of the evidence. This is a classic he said, she said kind of thing. Really, it's the trial court being present, being able to weigh the credibility of the witnesses in front of her. That really puts this into the classic question of fact. This is just a credibility case. The letter says she was respectfully requesting to resign without having a consequence of the one-year contract. That's the way she starts out the letter. She refers to it as a resignation letter. Albeit, she goes on to say she would be happy to discuss other issues. So, here's my question comes to mind. If somebody says, I'm going to resign unless you double my salary, the period goes by. Would you be able to argue realistically that's not a resignation letter, that was like an invitation to negotiate? Well, I think it's, as Justice Enum pointed out, it's a condition precedent. If condition A, my pay doesn't increase two-fold by whatever deadline is in the letter, then I will resign. But if negotiations are entered and my contract is approved and I get a higher pay, then I'm not going to. So, what happens at the end of two weeks if there's no further discussion or dialogue between employee and employer? You say, I'm going to resign once you double my salary. Nobody says anything. Is that a resignation letter? What I believe happens is that once the deadline passes and there's been no talk or anything like that, the resignation becomes effectuated. It would be a resignation letter. It would be. At that point, it would be considered an effectuated resignation letter. I agree. However, in this situation. So, what happened here that takes it out of it? Well, I think two major things take it out of it. One is the fact that there was testimony that it was the nursing home itself, the management structure there saying, we aren't getting the resources we need, so we need you to write this letter to upper management basically saying, I'm your new care manager. Things aren't going well. I'm going to quit unless you give me the resources I need. So, she didn't think she was forced? Yeah, she was. She was told by, I mean, she testified to this. She was told by Mr. Thompson, who was the nursing care administrator, and then the director of nursing, Ms. Manti, to draft this letter. Did the trial court find she was forced? The trial court, well, I have to believe so because she ruled in our favor saying that she was fired as opposed to resigned. She could have ruled in your favor that this was not really a reservation letter. And I think one of the problems they have ostensibly is arguably they jumped the gun. They didn't. That was going to be my second point was, and actually Judge Fabiani did mention this when she was stating her ruling, was that even if you take that letter to be a, I am resigning in two weeks, after just a few days, they showed her the door. But counsel argued that by her own actions, she effectuated her own resignation. How do you respond to that? Well, I think the point you made is really the point I would make, which is resignation is by nature a voluntary decision to make. And I think when we looked at the Addis case and the case I cited, the Hinthorn case, there's a distinction between the voluntary resignation and the involuntary resignation where someone tells you to write a letter or I'm going to fire you. In this situation here, she was shown the door prior to this letter even taking effect or anything like that. And the curious thing is that, you know, counsel mentioned she was being disruptive at the facility and everything like that. That sounds like a great reason to fire someone for cause, you know, but they didn't. They have never said that she was fired for causing. They've always said, well, she resigned. But then they won't fall back on this while she was being disruptive. So we had to let her go. You know, if somebody is being disruptive, I mean, what are they supposed to do? If somebody says, I'm resigning in two weeks unless you meet my demands, and they cause all sorts of problems, although Justice Brickett may have alluded to this, as a practical matter, what's the facility supposed to do? Can the employee sort of intentionally and truly set up a thing where I'm going to send this letter and say, but I'm going to wait around two weeks, and then I'm going to cause havoc in the facility, and you can't touch me because otherwise, you know, you're going to lose your claim to the $8,000. What are they supposed to do? I think that's a good argument in equity about negotiating in good faith or bad faith. You know, in a situation like that where someone intentionally engineers a situation, Yeah, that's something that happened. I don't think that the facility should be liable to then have to suffer the consequences of that action. They shouldn't be powerless, in other words, right? Right, right. Isn't that what she's saying will happen in this case? But that isn't what happened in this case because, well, the first response really is, you know, if my client wanted to leave this facility, and assuming they're correct, this is the worst and most crazy way of trying to quit a job imaginable. If she wanted to leave, she should have just left. And what about her – this entry on the contract that she made, when did she make that? Her testimony was she made that at the time that it was negotiated with Mr. Thompson. And I wanted to bring that up. Well, but normally the other side would have had to initial it, correct? Correct. I mean, in order for anyone to know that both sides had agreed to it. Absolutely. And this is one of the points I was going to raise up, that if anyone should be complaining about the decision by Judge Fabiano to deem that a contract did exist regarding the buyout, it should be me because based on the evidence that we put forth, you know, she testified that he agreed to this, that they had to renegotiate this portion, and that the original contract – the original version of this contract was never produced at trial. They were never able to pull it up. All we had was their alleged copy, and all we had was what we believed the copy to be. But they had signed – their copy was signed.  Right. Only had my client's signature after that. And only she had that. Correct. So – But – Counsel's point is that in terms of – obviously the trial court made this determination, weighed the credibility of the witnesses, but that that entry should be read together with her letter. In other words, she was looking for a way out without being responsible for paying back the $8,000 buyout. Right. And as I alluded to in my brief, I think that's just a negotiating tactic. You know, her problem was insufficient resources. She had been told that she was going to have a staff of nurses to assist her and that her caseload was not going to involve some of this Medicare data sheeting that was discussed briefly at trial and in the briefing. And then what happened is very quickly she didn't get the resources she needed. She didn't get the people she needed, and then she ended up having to do the Medicare data sheeting. She needed every bit of leverage she could. And $8,000 is not a bad piece of leverage to have because, you know, I don't think it's any great secret that nursing homes operate on a very slim budget, slim profit margin, and $8,000 honestly is a big deal when you look at these budgets. And so arguing that, hey, I need these resources, and if you don't give them to me, I'm going to leave. And by the way, you're not going to get the $8,000 out of me, I don't think that's a bad negotiating strategy. But again, all of that stuff is really explained and supported when you look at the evidence and you say, well, her management told her to do this, and so she did what her managers told her. Now, you can say, well, that's her story. But then you look at the assistant director of nursing saying she got fired. And then Dr. Pryor's testimony was brought up and counsel stated that Dr. Pryor's knowledge was based off what Ms. Nelson told her. Well, if you look at page 86 of the common record, Dr. Pryor had a conversation with Mr. Thompson. Mr. Thompson is the administrator of the nursing home. Mr. Thompson told Dr. Pryor that Ms. Nelson had been fired from the facility. So when you look at all these aspects of the case about who is telling the truth, whether it's Ms. Nelson or Mr. Thompson, you also can't divorce that from the testimony of Ms. Braswell and Dr. Pryor who have no interest in this case. And they worked at the facility. In fact, all these witnesses worked at the facility. Dr. Pryor in an independent contractor role, but he was still there visiting patients and still knew everyone there. And so you have three witnesses on one side, three witnesses on the other. And the trial court is in the position to make that judgment. And so to go back to the point about what about the contract, the buyout contract, which version, if anything, I feel we should be making the appeal on the first issue because we feel the evidence would have showed that she did, in fact, renegotiate this. But obviously, having won at the trial level, we weren't going to appeal that issue. Fundamentally, though, at the end of the day, for plaintiff to win an appeal, I think she's going to have to prove to you somehow that it's OK for you to reweigh this evidence, reweigh the credibility. And the witnesses aren't here. All we have is the bystander's report. And for plaintiff to then say, well, you need to latch on to this element of what this testimony said or what this testimony said, absent actually having those witnesses there to judge, I think would kind of fly in the face of what manifest review is all about. So for all those reasons, I'll request that this court affirm the trial court's findings of fact. Thank you. Thank you very much. May I please fire me? Yes. Just to address a couple of the final points made by opposing counsel. First, we heard the word coercion a lot. And I think it's important to keep in mind that the only testimony, the only evidence in the record that any kind of coercion, and keep in mind it was, hey, can you write a letter, was a statement by Ms. Nelson. Ms. Nelson, who the trial court did call her credibility into question. I think it's also important to keep in mind that this exactly does fit the manifest way to the evidence standard. There are serious questions as to whether or not the manifest way to the evidence truly supports that determination, that Ms. Nelson was credible in her testimony. She was the only person who testified that she had been asked to write a letter. Did the trial court find that the employee was coerced? No. There was nothing in the bystander's report or in the ruling, no. And again, the only testimony that was pertinent to that, and it was much more tame than using the word coerced, it was Ms. Nelson's own testimony that she was asked to write a letter, to ask for more resources, which is clearly very different. Asked as opposed to required to? Exactly. And then I think it's also important when looking at the issue with the two different versions of the contract to also keep in mind all the other steps that Ms. Nelson took that kind of identified that she recognized that the actual version of the contract that was in play was the Fairview version of the contract. Her resignation letter asked to be let out of the buyout. Mr. Thompson's testimony, he stated that, well, when she handed me the resignation letter, she asked me to be let out of the buyout. I think it's important to keep that in mind, too, when reviewing the trial court's determination on Ms. Nelson's credibility. As such, we ask that you find that this determination is against the manifest way to the evidence and enter a ruling in favor of Fairview. Thank you. Thank you very much. The court will take the matter under advisement and render a decision in due course. The court stands in brief recess until the next case. Thank you, counsel.